JUDGE BERMAN

10 CV 873

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Jonathan Farber, Plaintiff, v. Goldman Sachs Group, Inc. and Goldman Sachs & Co., Defendants. | No. COMPLAINT |

RECEIVED FEB - 3 2010 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiff Jonathan Farber ("Mr. Farber" or "Plaintiff"), by his undersigned attorneys, alleges against defendants Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (collectively, "Goldman" or "Defendant") on personal knowledge as to his own conduct and on information and belief as to his remaining allegations, as follows:

1. This is a claim under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and state law arising out of a scheme by Goldman to defraud Mr. Farber -- through material misrepresentations, failures to satisfy duties to disclose material facts and market manipulation -- all in connection with the purchase and sale of $1 million in Goldman auction rate securities ("PARS$^{SM}$") to Mr. Farber.

2. When, due to Goldman's conduct -- and as a product of material facts Goldman had misrepresented and failed to disclose -- the PARS$^{SM}$ market suddenly collapsed on February 13, 2008, Mr. Farber was left holding virtually unsalable PARS$^{SM}$ instruments that have lost hundreds of thousands of dollars in value. Furthermore, as a direct consequence of Goldman's

fraud, and Mr. Farber's inability to liquidate and otherwise invest the funds at issue, Mr. Farber has, to date, suffered in excess of $1 million in additional damages.

Parties

3. Plaintiff Jonathan Farber is a citizen and resident of the State of Connecticut, with a residence in Norwalk, Connecticut.

4. Defendant Goldman Sachs Group, Inc. is a Delaware Corporation with its principal place of business in New York, New York.

5. Defendant Goldman Sachs & Co. is a New York limited partnership, and a wholly owned affiliate of Goldman Sachs Group Inc., with its principal place of business in New York, New York. Goldman Sachs & Co. is registered with the Securities and Exchange Commission as a broker-dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934 and – among other things – underwrites issuances of securities, and also markets and sells securities to institutional and retail clients.

Jurisdiction and Venue

6. This Court has original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), because they are part of the same case and controversy described by Plaintiff's federal claims.

8. Alternatively, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as it is a dispute between citizens of different states with an amount in controversy exceeding $75,000.00, exclusive of interest and costs.

9. Venue is proper pursuant to pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391. Goldman Sachs Group, Inc. and Goldman Sachs & Co. reside in this District and Goldman routinely solicits business, and can otherwise be found, in this District; furthermore, a substantial part of the event and omissions giving rise to this action occurred in this District.

10. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Goldman, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

Background

11. This proceeding arises from Goldman's conduct of a massive scheme to defraud participants in one of the nation's largest debt markets, that for auction rate securities.

12. Despite a finding by the New York Attorney General that Goldman systematically defrauded its customers, including Mr. Farber, into purchasing millions of dollars in auction rate securities for which Goldman paid a $22.5 million penalty (In re Goldman Sachs & Co., Assurance of Discontinuance, dated June 7, 2009 ("Assurance of Discontinuance", annexed as Exhibit A hereto)), Goldman has refused to cure the damage it caused to Mr. Farber. This action has followed.

13. Goldman's role in the lucrative auction rate securities market. The idea behind the creation, in the late 1980s, of auction rate securities by firms including Goldman was to devise a debt instrument that behaved like a long-term bond for issuers (who were often governmental entities), but constituted a cash equivalent instrument for the purchasers of the securities.

14. A "cash equivalent" is a highly liquid, short term instrument with an extremely low risk of capital loss and the ability to be readily converted into cash. Cash equivalents include instruments such as Treasury Bills, commercial paper and money market fund shares.

15. To accomplish this end, underwriters created long term debt securities that traded in periodic "Dutch" auctions, typically managed by underwriting firms and held every 7, 28 or 35 days, in which bids were taken and the securities' yields were reset. A key element of auction rate securities was the inclusion of an auction failure interest rate provision that – in the event of an ongoing auction failure – would raise the applicable yield on the instruments to a rate that would induce the issuer to redeem.

16. At the outset and for years thereafter, the typical Dutch auction bidders, apart from the underwriters and other securities firms, were institutional purchasers.

17. Auction rate securities initially appeared to be an attractive addition to the debt markets. Issuers were able to issue long-term debt at competitive short term rates. On the other hand, purchasers were able to earn a higher yield on (what underwriters described as) highly liquid securities.

18. Goldman was one of the principal developers of, and became one of the dominant participants in, the multi-billion dollar auction rate securities market. The firm underwrote auction rate securities for issuers throughout the country and managed the periodic Dutch auctions for many of the issues it underwrote, while marketing the securities to its large institutional client base – and reaping large fee and other income from all of these transactions.

19. The fees Goldman realized for underwriting auction rate issues were particularly lucrative, and were often based on a percentage of the principal amounts of the (often very large)

debt issues. In addition, the firm derived substantial, regular income from managing auction rate securities auctions, as well as selling the securities to customers.

20. Goldman represented to customers that its auction rate securities products constituted a single, cash equivalent, product line. Goldman even claimed its own service mark for the line, PARS℠, which Goldman placed prominently on the cover of official statements for Goldman underwritten auction rate issues.

21. From the outset, it was plain that the only potential risk for derailing Goldman's PARS℠ gravy train was the possibility that institutional purchasers' demand for the instruments -- and thus their essential participation in the Dutch auctions -- would decline or even end. In the worst case scenario, the auctions for a PARS℠ issue could fail, and with it the ability of holders to sell their securities in the market. A substantial number of failed auctions would not only leave holders high and dry, but could also threaten the ability of Goldman and other underwriters and auction managers to bring new auction rate issues to market.

22. The stakes were very high, and Goldman and its fellow securities firms had strong financial incentives to keep the auctions going even in the face of market resistance. Unfortunately for purchasers like Mr. Farber, when that resistance ultimately appeared, Goldman chose to keep the gravy train running through a massive fraud scheme.

23. <u>The hidden collapse of the PARS℠ market and Goldman's resort to a systemic cover bidding scheme</u>. Right up until the wholesale freezing of virtually the entire PARS℠ market on February 13, 2008, purchasers had every reason to believe that the market, and the periodic auctions that supported it, were operating in regular course – and thus that the securities continued to amount to extremely liquid "cash equivalents."

24. As Mr. Farber and other PARS℠ purchasers later learned, however, beginning by 2005 at the latest, Goldman was faced with a growing and serious impairment to the auctions on which the viability of PARS℠ depended, as institutional purchasers exited from the market.

25. Instead of disclosing these defects, however, Goldman used fraud to hide the increasingly untenable state of the market from purchasers – even as the firm likewise used deception to recruit thousands of new retail purchasers replace the institutional purchasers who were fleeing the PARS℠ market in droves.

26. The institutional exodus from the auction rate securities market continued throughout 2006 and began to accelerate in early 2007.

27. According to the findings of the New York Attorney General, Goldman was well aware of the "strains in the auction rate securities market" posed by the loss of large portions of the institutional customer base. Assurance of Discontinuance, at 5. Indeed, according to the Attorney General, as the institutional investors fled, Goldman secretly began to "question[]" the very "viability" of the market. Id.

28. Under these circumstances, the proper course of action was clear: Goldman should have ceased (falsely) marketing its PARS℠ products as "cash equivalents" and warned potential purchasers that the strains in the market posed a threat of imminent collapse. Goldman, however, chose a different course.

29. According to the Assurance of Discontinuance, Goldman devised a scheme to engage in massive and systemic "cover bids" in the periodic PARS℠ auctions it managed, thereby replacing the bids of the institutional purchasers that were fleeing the market with bids from Goldman, often for all or most of the securities sold at auction.

30. Goldman, along with other auction rate securities underwriters, also began to encourage issuers of its service-marked PARS℠ to permit temporary upward "adjustments" in normally applicable interest rate ceilings, which otherwise threatened to render the securities un-saleable. These "adjustments" allowed Goldman to scheme to hide structural defects in many PARS℠ issuances which were threatening to come to light as the ranks of auction participants became perilously thin.

31. The scheme worked, insofar as it concealed the strains that Goldman had secretly concluded were fatally undermining the viability of the PARS℠ market.

32. According to the New York Attorney General's findings, however, Goldman's proprietary purchases ultimately became so massive that the firm had to obtain waivers from its own internal risk management rules so as to allow the firm to maintain a ballooning proprietary inventory of PARS℠ on its books. Id. at 4-5; see also id. at 3-4 (stating that, "[f]or risk management purposes, Goldman Sachs imposed limits on the amounts of securities its Municipal Money Markets unit could hold (which included Goldman Sachs' auction rate securities holdings)").

33. The scheme to defraud retail customers. Faced with the loss of the crucial institutional purchaser base, and its own growing PARS℠ inventories, Goldman set out to find a new group of customers on which to unload its unwanted -- and non-viable -- PARS℠ securities.

34. According to the New York Attorney General, Goldman chose to defraud its retail customers. As recited in the Assurance of Discontinuance, Goldman embarked on a scheme aggressively to market PARS℠ to individuals and other customers with a need for cash equivalent instruments.

35. To this end, Goldman's sale force assured customers that "that auction rate securities were secure, liquid securities that were a suitable alternative for cash management purposes." Assurance of Discontinuance, at 3.

36. As detailed in the Attorney General's Assurance of Discontinuance -- given Goldman's secret internal conclusion that the PARS℠ market was collapsing and had passed the point of viability -- these representations were knowingly and materially false and "misleading." Id.

37. Based on these misrepresentations -- and without knowledge of the exit of institutional purchasers from the PARS℠ market or Goldman's secret cover bidding scheme -- Goldman retail customers purchased millions of dollars in PARS℠. Goldman thereby succeeded in unloading portions of the PARS℠ that were accumulating in its own accounts.

38. Goldman's own retail customer base was, not however, sufficiently large fully to satisfy Goldman's goal of unloading huge portions of its growing PARS℠ inventories before the inevitable market collapse. Accordingly, Goldman sought alternative retail outlets for its increasing inventory of PARS℠, including, among others, discount brokerage firms like E*Trade Securities LLC ("E*Trade").

39. Given that the customers of these retail firms were -- like those customers who purchased PARS℠ directly from Goldman -- unaware of the non-viability of the PARS℠ market (or of Goldman's massive proprietary auction purchases), they proved to be ready targets for the growing fraud scheme.

40. Mr. Farber twice becomes a target for Goldman's PARS℠ fraud scheme. Mr. Farber is among the numerous Goldman customers who count among the victims of Goldman's PARS℠ fraud scheme. Indeed, he was defrauded in two separate ways: First, through

Goldman's scheme to defraud its own customers through fraudulently induced direct PARS℠ sales; and, second, through Goldman's scheme to fraudulently market PARS℠ through retail brokerage firms.

41. Mr. Farber was a long time customer of Goldman Sachs' Private Client Services unit and regularly used his Goldman account for cash management purposes.

42. Thus, as Goldman well knew, Mr. Farber regularly needed to liquidate substantial portions of his holdings to satisfy various obligations, including and especially estimated tax payments.

43. To that end, Mr. Farber had customarily placed his Goldman account holdings in highly conservative, liquid and often cash equivalent instruments, including short term government bonds and mutual funds investing in short term debt securities.

44. During or around 2006, a Goldman sales person with purported expertise in debt and fixed income instruments approached Mr. Farber with the suggestion that Mr. Farber liquidate much of the debt and bond mutual fund holdings in his Goldman account and replace those holdings with PARS℠.

45. In suggesting that Mr. Farber purchase large volumes of PARS℠, the Goldman salesman emphasized to Mr. Farber that PARS℠ were cash equivalents – and were appropriate for cash management purposes, including as a repository for funds required for periodic tax payments and other short term needs.

46. The Goldman fixed income salesman, along with other members of Goldman's sales staff, repeatedly emphasized to Mr. Farber that the risk of the supposedly "cash equivalent" PARS℠ becoming illiquid was highly remote -- both because any auction failure for a particular PARS℠ issuance would likely be cured by the time of the next auction through an increase in

the yield and because, even in the remote and unlikely event of an ongoing auction failure, high auction failure interest rate provisions would induce issuers to redeem the securities.

47. Goldman personnel further emphasized to Mr. Farber that the attributes of cash equivalency and liquidity were shared by virtually all of the instruments in the Goldman PARS[SM] product line, and not just certain such instruments. Accordingly, Mr. Farber agreed to delegate to Goldman the authority to choose which among the scores of available PARS[SM] issuances to purchase on his behalf, secure in the understanding that all such securities shared the fundamental attributes of liquidity and cash equivalency – just as Goldman had represented.

48. Goldman did not limit itself to oral material misrepresentations regarding PARS[SM]. Goldman supplemented the repeated, and materially false, representations of its sales force with a series of material misrepresentations in the periodic account statements Goldman sent to Mr. Farber.

49. These statements squarely and consistently described Mr. Farber's PARS[SM] holdings as "cash equivalents," including after the PARS[SM] market began it secret (and deliberately hidden) collapse.

50. Based on these false representations, Mr. Farber purchased millions of dollars of various PARS[SM] issues directly from Goldman, commencing during 2006 and continuing through 2007.. During the relevant time period, Mr. Farber was also a customer of E*Trade, a discount brokerage firm with a large retail customer base, that – unbeknownst to Mr. Farber – Goldman had enlisted to unload portions of its increasing PARS[SM] holdings.

51. On information and belief, Goldman sent E*Trade daily memoranda listing portions of Goldman's rapidly growing PARS[SM] inventory that Goldman had on offer.

52. On or around May 29, 2007, Mr. Farber received a call from an E*Trade salesman, who solicited him to purchase a Goldman PARS℠ issued by the Massachusetts Health and Education Facilities Authority: Children's Hospital Series I, dated May 31, 2001, Due October 1, 2040, CUSIP 57585KQWI (the "HEFA PARS℠").

53. Having repeatedly been assured by Goldman, orally and in writing that <u>all</u> Goldman PARS℠ were "equivalent" to "cash," Mr. Farber had little reason to hesitate. Consequently, on May 29, 2007, Mr. Farber purchased $1,000,000 of the HEFA PARS℠.

54. <u>The massive PARS℠ fraud scheme collapses, but Goldman fails to make Mr. Farber whole</u>. For months thereafter, Goldman's massive PARS℠ fraud scheme continued apace. Mr. Farber continued to receive monthly account statements from Goldman describing PARS℠ as cash equivalents, and received no information regarding Goldman's secret conclusion that the market was headed toward collapse.

55. But Goldman and its fellow schemers could not, or would not, keep up the charade forever.

56. The manipulation of the PARS℠, along with the rest of the auction rate securities, market effectively ended on February 13, 2008, when major broker-dealers, including Goldman, stopped "supporting" the market.

57. On or around that day, approximately 87% of all auction rate securities auctions failed, including the market for the HEFA PARS℠ issue that Goldman fraudulently induced Mr. Farber to purchase. Mr. Farber thus joined thousands of unfortunate purchasers in holding auction rate securities could not be sold in what became a frozen market.

58. <u>The truth (belatedly) comes out</u>. Only in the ensuing months did purchasers like Mr. Farber learn that their losses were the product of a massive fraud scheme and that the market

for PARS$^{SM}$ "cash equivalents" had been an elaborate ruse, structured and maintained to unload what were ultimately all but certain to become unmarketable securities on unknowing purchasers.

59. As the truth came out, Goldman was, slowly and far too late, forced to admit to the falsity of some of its past representations to Mr. Farber, beginning with an account statement for the period ending February 29, 2008. In that statement, PARS$^{SM}$ were no longer listed as "Cash Equivalents," but were instead placed in a category titled "Cash Equivalents & Auction Rate Securities."

60. In a statement for the period ending March 31, 2008, Goldman went on to admit that PARS$^{SM}$ "may be considered to be illiquid, particularly if they have been subject to a failed auction."

61. In a statement for the period ending April 30, 2008, Goldman further conceded that "there is no guarantee that there will be liquidity" with PARS$^{SM}$ and that, in the wake of an auction failure, there is "no assurance that a secondary market will develop or that the security will continue to trade at par." By then, however, the damage had long been done.

62. The NYAG Settlement and the incomplete remedies to date. As a result of its fraudulent practices, Goldman came to be, and, on information and belief, as of this writing remains, under investigation by both state and/or federal l$^{aw}$ regulatory and enforcement agencies.

63. On August 21, 2008, Goldman announced that it had entered into a settlement with the New York Attorney General (which was subsequently memorialized in the Assurance of Discontinuance), and later paid a fine of approximately $22.5 million and agreed to buy back at

par approximately $1 billion in unmarketable PARS℠ from certain customers who had purchased their PARS℠ holdings directly from Goldman.

64. Consequently, Goldman eventually repurchased from Mr. Farber a holding of Harris County, Texas Health Facility PARS℠, which it had sold to Mr. Farber directly.

65. The NYAG Settlement did not, however, mandate that Goldman repurchase the PARS℠ it fraudulently unloaded through other broker-dealers, such as E*Trade. Furthermore, Goldman squarely refused Mr. Farber's request that it repurchase his holding of HEFA PARS℠.

66. Goldman refused, despite the fact Mr. Farber had purchased the HEFA PARS℠ while he was a Goldman customer <u>and</u> in reasonable reliance on Goldman's direct, repeated material misrepresentations to him.

67. To add insult to this fraudulently wrought injury, the interest rate payable on the HEFA PARS℠ upon an auction failure -- rather than being a rate high enough to incentivize repurchase by the issuer, as Mr. Farber had been told to expect – turned out to be keyed to the seven day "AA" non-financial commercial paper rate, which has hovered near zero for many months.

68. In fact, since the beginning of 2009, the "failure" rate paid to Mr. Farber has been below 0.5 percent . This is in contrast to the 3.7% that the security was yielding at the time of Mr. Farber's purchase in May 2007.

69. Unlike commercial paper, however, which is among the most liquid short term debt in the marketplace, the HEFA PARS℠ is virtually unsalable. Furthermore, the HEFA PARS℠ will not mature until 2040; accordingly – absent relief from this court – Mr. Farber could be forced to continue to make what amounts to a $1 million near interest-free loan for 30 more years.

70. In sum, far from having the "cash equivalent" liquid security he was promised by Goldman, Mr. Farber has had one million dollars in the securities market equivalent of limbo for the better part of two years – and has had to forego valuable investment opportunity after opportunity as a consequence. Based on the returns Mr. Farber has received from his other investments during this period (approximately 100%), Mr. Farber has been consequentially damaged by in excess of $1 million as a result of being subjected to this fraud.

71. Goldman's effort to deny Mr. Farber the opportunity to pursue his claims. Mr. Farber originally asserted the claims alleged herein in a FINRA arbitration proceeding against both Goldman and E*Trade, filed in April 2009. Goldman later made a motion to dismiss the claims against it before the FINRA panel, based on the proposition that the claims fell outside the scope of FINRA's arbitration jurisdiction because Goldman did not sell the HEFA PARS$^{SM}$ directly to Mr. Farber.

72. On or around December 23, 2009, the panel granted Goldman's motion to dismiss on these jurisdictional grounds. Notably, the motion to dismiss was not granted with prejudice. Furthermore, the panel's written decision was expressly based on the non-merits based rationale asserted in Goldman's motion papers, and neither addressed nor decided the merits of Mr. Farber's fraud claims against Goldman, including whether Goldman made material misrepresentations respecting which Mr. Farber reasonably relied in connection with his purchase of the HEFA PARS$^{SM}$ from E*Trade.

73. As of the date of this pleading, Mr. Farber continues to pursue his claims against E*Trade in arbitration.

No Safe Harbor

74. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this claim. See sec. 21(E) of the Securities Exchange Act of 1934 and sec. 27(A) of Security Act of 1933. Goldman's materials misstatements and omissions concerned present facts about the securities at issue and the market in which they traded. Thus, the "safe harbor" does not apply even if some or all of the statements were identified as forward looking.

COUNT I

Violation of Section 10(b) of the Securities Exchange Act of 1934
(15 U.S.C. § 78j(b)) and Rule 10b-5 there under (17 C.F.R. § 204.10b-5)

75. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 74 above as if fully set forth herein.

76. As set forth herein, Goldman, in connection with the sale of the HEFA PARS[SM] to Mr. Farber and acting with scienter, (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or failed to satisfy an obligation to state material facts; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Mr. Farber, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 there under.

77. As a direct and proximate result of Goldman's wrongful conduct, Mr. Farber suffered damages and Goldman is directly liable therefore to Mr. Farber.

COUNT II

Violation of Section 20(a) of the
Securities Exchange Act of 1934 (15 U.S.C. § 78t(a))

78. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 77 above as if fully set forth herein.

79. As set forth herein, Goldman was, at the time of the wrongs alleged herein, a controlling person of its salespersons within the meaning of Section 20(a) of the Exchange Act, including at the time of, and in connection with, the primary violations of the 1934 Act alleged herein.

80. As a consequence, Goldman owes joint and several liability for the damages arising from the primary violations of any such controlled persons.

COUNT III

Violation of Section 36b-29(2)
of the Connecticut Uniform Securities Act

81. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 80 above as if fully set forth herein.

82. As fully set forth herein, Goldman (a) materially assisted in the offer and sale of HEFA PARS$^{SM}$ to Mr. Farber by means of untrue statements of a material facts and/or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (b) Goldman knew or in the exercise of reasonable care should have known of the untruths and/or omissions, in violation of Section 36b-29 of the Connecticut Uniform Securities Act.

83. As a direct and proximate result of Goldman's wrongful conduct, Mr. Farber suffered damages and Goldman is directly liable therefore to Mr. Farber.

COUNT IV

Common Law Fraud

84. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 83 above as if fully set forth herein.

85. As set forth herein, Goldman acting with scienter (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or failed to satisfy an obligation to state material facts; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Mr. Farber.

86. As a direct and proximate result of Goldman's wrongful conduct, Mr. Farber suffered damages and Goldman is directly liable therefore to Mr. Farber.

COUNT V

Breach of Fiduciary Duty

87. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 86 above as if fully set forth herein.

88. At the time that Mr. Farber was urged to invest in the HEFA PARS$^{SM}$, and at all times thereafter, Goldman acted as Mr. Farber's stock broker and advisor. As such, there existed a fiduciary relationship between Goldman and Farber as regards the disclosure of material facts.

89. Pursuant to the aforementioned relationship, Mr. Farber's trust and confidence were placed in Goldman. Thus, Goldman was obligated to promptly disclose to Mr. Farber any and all material facts concerning the true nature of PARS$^{SM}$, including Goldman's secret role in "supporting" the market for the securities, and the consequences should Goldman decide to stop such conduct.

90. Goldman breached its fiduciary duty to Mr. Farber in that it failed to disclose and continuously concealed from Mr. Farber the facts set forth herein and other material facts concerning the PARS$^{SM}$ market.

91. As a direct and proximate result of Goldman's breach of fiduciary duty as described above, Mr. Farber suffered damages and Goldman is directly liable therefore to Mr. Farber.

COUNT VI

Aiding and Abetting
Breach of Fiduciary Duty

92. Mr. Farber repeats and realleges each and every allegation set forth in paragraphs 1 through 91 above as if fully set forth herein.

93. At the time that Mr. Farber was urged to invest in the HEFA PARS$^{SM}$, and at all times thereafter, a fiduciary relationship existed between Mr. Farber and E*Trade.

94. Pursuant to the aforementioned relationship, Mr. Farber's trust and confidence were placed in E*Trade. Thus, E*Trade was obligated to promptly disclose to Mr. Farber all material facts concerning the true nature of PARS$^{SM}$ market in general, and the particular facts regarding the HEFA PARS$^{SM}$, including Goldman's secret role in "supporting" the market for the securities, and the consequences should Goldman decide to stop such conduct.

95. E*Trade breached its fiduciary duty to Mr. Farber in that it failed to disclose and continuously concealed from Mr. Farber the facts set forth herein and other material facts concerning the PARS$^{SM}$ market.

96. Goldman knowingly induced or participated in E*Trade's breach of fiduciary duty.

97. As a direct and proximate result of Goldman's aiding and abetting of E*Trade's breach of fiduciary duty as described above, Mr. Farber suffered damages and Goldman is directly liable therefore to Mr. Farber.

WHEREFORE, Mr. Farber prays for relief and judgment, as follows:

A. Repurchase by Goldman of the HEFA PARS[SM];

B. Lost profits from February 13, 2008;

C. Consequential damages resulting from the inability to sell the HEFA PARS[SM] held by Mr. Farber after February 13, 2008;

D. Punitive damages;

E. An award of Mr. Farber's reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F. Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
February 3, 2010

Respectfully submitted,

David R. Lurie
Law Office of David R. Lurie
194 President Street
Brooklyn, New York 11231
Phone: 347-651-0194

Counsel to Plaintiff Jonathan Farber

Of Counsel:

Bruce G. Hart
Law Office of Bruce G. Hart
875 Third Avenue, 19th Floor
New York, New York 10022
Phone: 646-267-3699

# EXHIBIT A

ATTORNEY GENERAL OF THE STATE OF NEW YORK
INVESTOR PROTECTION BUREAU

---

IN THE MATTER OF

GOLDMAN, SACHS & CO.

---

**ASSURANCE OF DISCONTINUANCE**
**PURSUANT TO EXECUTIVE LAW § 63(15)**

On April 14, 2008, the Office of the Attorney General of the State of New York (the "Attorney General"), commenced an investigation, pursuant to Article 23-A of the General Business Law (the "Martin Act"), of Goldman, Sachs & Co. ("Goldman Sachs") and its subsidiaries and affiliates, concerning Goldman Sachs's marketing, sale and distribution of auction rate securities (the "Investigation"). This Assurance of Discontinuance ("Assurance") contains the findings of the Attorney General's Investigation and the relief agreed to by the Attorney General and Goldman Sachs.

**FINDINGS**

The Attorney General finds as follows:

**I. Relevant Entity**

1. Goldman Sachs is a New York limited partnership and a wholly-owned affiliate of The Goldman Sachs Group, Inc. It is licensed to do business in the State of New York and its principal executive offices are located in New York City. Goldman Sachs is a registered broker-dealer that offers, among other things, brokerage and investment services to investors across the United States.

## II. Background on Auction Rate Securities

2. Auction rate securities are long-term bonds issued by municipalities, corporations and student loan companies, or perpetual equity instruments issued by closed-end mutual funds that pay an interest rate that resets periodically through a bidding process known as a Dutch auction.

3. At a Dutch auction, bidders generally state the number of auction rate securities they wish to purchase and the minimum interest rate or dividend rate they are willing to accept. Bids are ranked, from lowest to highest, according to the minimum interest rate or dividend each bidder is willing to accept. The lowest interest rate required to sell all of the auction rate securities available at auction, known as the "clearing rate," becomes the rate paid to all holders of that particular security until the next auction. The process is then repeated, typically every 7, 28 or 35 days.

4. When there are not enough orders to purchase all of the auction rate securities being sold, a "failed" auction occurs. In the event of a failed auction, investors who wish to sell their auction rate securities cannot do so in that auction.

5. Goldman Sachs acted as an underwriter and as the auction broker-dealer for certain issues of auction rate securities. When acting as sole manager, Goldman Sachs was the only firm that could submit bids into the auction on behalf of its clients and/or other broker-dealers who wanted to buy and/or sell any auction rate securities in such auctions. When acting as lead manager, Goldman Sachs was the primary firm that could submit bids into the auction, but other auction broker-dealers were able to submit orders on behalf of their clients as well. Goldman Sachs received revenue in connection with auction rate securities, including an underwriting fee representing a percentage of total issuance and a fee for managing the auctions.

## III. Goldman Sachs Made Representations that were Misleading to Certain Investors in Connection With the Sale of Auction Rate Securities

6. Goldman Sachs represented to certain of its customers that auction rate securities were secure, liquid securities that were a suitable alternative for cash management purposes. It did so through its sales force, some of whom represented to certain investors that auction rate securities were highly liquid, safe investments for cash management purposes.

7. These representations were misleading as to certain investors. Auction rate securities were in fact different from cash and money market funds. As discussed above, the liquidity of an auction rate security relied on the successful operation of the Dutch auction process. In the event of a failed auction, investors cannot sell their auction rate securities in that auction and are potentially stuck holding long-term investments, not money market instruments. As discussed below, starting in the Fall of 2007, the auction rate securities market faced dislocation and an increased risk of auction failure.

8. Since it began participating in the auction rate securities market, Goldman Sachs submitted "cover" bids, purchase orders for the entirety of an auction rate security issue for which it acted as the sole or lead auction manager. Such "cover" bids were Goldman Sachs proprietary orders that would be filled, in whole or in part, to the extent there was otherwise insufficient demand in an auction. When Goldman Sachs purchased auction rate securities through "cover" bids, those securities were then owned by Goldman Sachs as principal and the holdings were recorded on Goldman Sachs' balance sheet. For risk management purposes, Goldman Sachs imposed limits on the amounts of

securities its Municipal Money Markets unit could hold (which included Goldman Sachs' auction rate securities holdings).

9. Because many investors could not ascertain how much of an auction was filled through Goldman Sachs "cover" bids, those investors could not determine if auctions were clearing because of normal marketplace demand, or because Goldman Sachs was making up for the lack of demand through "cover" bids. Many investors were also not aware that the liquidity of these auction rate securities was dependent upon Goldman Sachs's use of "cover" bids for its operation. While Goldman Sachs could track its own inventory as a measure of the supply and demand for auction rate securities, many investors had no comparable ability to assess the operation of the auctions. There was no way for those investors to monitor supply and demand in the market or to assess when broker-dealers might decide to stop supporting the market, which could cause its collapse.

## IV. In the Fall of 2007, The Auction Rate Securities Market Faced Dislocation

10. In August 2007, the credit crisis and other deteriorating market conditions began to strain the auction rate securities market. Some institutional investors withdrew from the market, decreasing demand for auction rate securities.

11. The resulting market dislocation should have been evident to Goldman Sachs. When customer demand for its auction rate securities declined, Goldman Sachs' "cover" bids filled the increasing shortfall, thereby sustaining the impression for certain investors that auctions managed by Goldman Sachs were functioning. As a result, Goldman Sachs's auction rate securities inventory grew significantly, requiring

Goldman Sachs to raise its risk management limits for its Municipal Money Markets business (which included auction rate securities) several times.

12. From the Fall of 2007 through early February of 2008, demand for auction rate securities continued to erode and Goldman Sachs's auction rate securities inventory increased significantly. Goldman Sachs was aware of the increasing strains in the auction rate securities market and increasingly questioned the viability of the auction rate securities market. Goldman Sachs did not disclose these increasing risks of owning or purchasing auction rate securities to all of its customers.

13. In February 2008, Goldman Sachs and other firms stopped supporting auctions. Without the benefit of "cover" bids, the auction rate securities market collapsed, leaving certain investors who had been led to believe that these securities were liquid, safe investments appropriate for managing short-term cash needs, holding long-term or perpetual securities that could not be sold at par value until and if the auctions cleared again.

## VI. Violations

14. The foregoing acts and practices of Goldman Sachs violated the Martin Act, Article 23-A of the General Business Law.

15. The foregoing acts and practices of Goldman Sachs violated § 349 of the General Business Law.

16. The foregoing acts and practices of Goldman Sachs violated § 63(12) of the Executive Law.

## AGREEMENT

WHEREAS, the parties agree to settle allegations that Goldman Sachs' conduct violated the Martin Act, General Business Law § 349 and Executive Law § 63(12) and

the Attorney General can bring an action when representations are misleading in connection with the sale of securities and scienter need not be proven to establish a violation of the Martin Act, General Business Law § 349 and Executive Law § 63(12);

WHEREAS, Goldman Sachs neither admits nor denies the Attorney General's Findings set forth above;

WHEREAS, the Attorney General is willing to accept the terms of the Assurance pursuant to New York Executive Law § 63(15), and to discontinue, as described in paragraph 56 below, its Investigation of Goldman Sachs;

WHEREAS, the parties each believe that the obligations imposed by this Assurance are prudent and appropriate;

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the parties, that:

## I. <u>Relief for Auction Rate Security Investors</u>

### A. Buybacks from Auction Rate Securities Investors

17. Goldman Sachs shall have provided liquidity to Eligible Investors by offering to buy back Eligible Auction Rate Securities that since February 11, 2008 have not been auctioning, at par, in the manner described below.

18. "Eligible Auction Rate Securities," for the purposes of this Assurance, shall mean auction rate securities purchased from Goldman Sachs on or before February 11, 2008.

19. "Eligible Investors," for the purposes of this Assurance, shall mean:

i. Natural persons (including their IRA accounts, testamentary trust and guardianship accounts) who purchased Eligible Auction Rate Securities from Goldman Sachs;

ii. Charities, endowments or foundations with Internal Revenue Code Section 501(c)(3) status that purchased Eligible Auction Rate Securities from Goldman Sachs, with the exception of educational endowments and health care organizations that had more than $10 million in assets in their accounts with Goldman Sachs; and

iii. Small Businesses that purchased Eligible Auction Rate Securities at Goldman Sachs. For purposes of this provision, "Small Businesses" does not include (i) broker-dealers, banks or other financial services firms acting as conduits for their customers, or (ii) Goldman Sachs customers not otherwise covered by paragraph 19(i) and (ii) above that had over $10 million in assets in their accounts with Goldman Sachs (or if the customer custodied portions of its investment purchased from Goldman Sachs away from Goldman Sachs, then, had over $10 million in assets purchased from Goldman Sachs, net of margin loans, plus those assets purchased from Goldman Sachs but custodied elsewhere).

iv. In no event shall Goldman Sachs be required by this Assurance to purchase more than $10 million of auction rate securities from any Small Business.

20. Goldman Sachs shall have offered to purchase, at par plus accrued and unpaid dividends/interest, from Eligible Investors their Eligible Auction Rate Securities that since February 11, 2008 have not been auctioning ("Buyback Offer"), and explain what Eligible Investors must do to accept, in whole or in part, the Buyback Offer. The

Buyback Offer shall have remained open until at least November 12, 2008 ("Offer Period"). Goldman Sachs may extend the Offer Period beyond this date.

21. Goldman Sachs shall have undertaken its best efforts to identify and provide notice to Eligible Investors who invested in Eligible Auction Rate Securities that since February 11, 2008 have not been auctioning, of the relevant terms of the settlement between Goldman Sachs and the Attorney General.

22. Eligible Investors may have accepted the Buyback Offer by notifying Goldman Sachs at any time before midnight, Eastern Time, November 12, 2008, or such later date and time as Goldman Sachs may extend the Offer Period. For Eligible Investors who accepted the Buyback Offer within the Offer Period, Goldman Sachs shall have purchased the Eligible Auction Rate Securities on or before November 17, 2008 (or a later date if an offer period is extended). For Eligible Investors who accepted the Buyback Offer within the Offer Period but custodied their Eligible Auction Rate Securities away from Goldman Sachs, Goldman Sachs shall repurchase the Eligible Auction Rate Securities upon receipt of assurance reasonably satisfactory to Goldman Sachs from the Eligible Investor's current financial institution that the bidding rights associated with the Eligible Auction Rate Securities will be transferred to Goldman Sachs and transfer of the Eligible Auction Rate Securities.

23. No later than December 31, 2009, any Eligible Investor who for good cause (including but not limited to incapacity or failure to receive the notice provided for in paragraph 21) did not accept the Buyback Offer pursuant to paragraph 22 above, shall be entitled to sell their Eligible Auction Rate Securities, at par, to Goldman Sachs for

(30) days after establishing such good cause, and Goldman Sachs shall purchase such Eligible Investor's Eligible Auction Rate Securities promptly.

24. No later than October 20, 2008, Goldman Sachs shall have established a dedicated toll-free telephone assistance line, with appropriate staffing, to provide information and to respond to questions from clients concerning the terms of the settlement between Goldman Sachs and the Attorney General.

**B. Relief for Eligible Investors Who Sold Below Par**

25. By November 12, 2008, Goldman Sachs shall have undertaken its best efforts to identify any Eligible Investor who sold Eligible Auction Rate Securities below par between February 11, 2008 and August 21, 2008 and shall have paid any such Eligible Investor the difference between par and the price at which the Eligible Investor sold the Eligible Auction Rate Securities.

**C. Reimbursement for Related Loan Expenses**

26. Goldman Sachs shall have made best efforts to identify Eligible Investors who took out loans from Goldman Sachs, between February 11, 2008 and the date of this Assurance, that were secured by Eligible Auction Rate Securities that were not successfully auctioning at the time the loan was taken out from Goldman Sachs, and paid interest associated with the auction rate securities based portion of those loans in excess of the total interest and dividends received on the auction rate securities during the duration of the loan. Goldman Sachs shall have reimbursed such customers for the excess expense, plus reasonable interest thereon. Such reimbursement shall have occurred no later than March 31, 2009.

### D. Consequential Damages Arbitration Process

27. Goldman Sachs shall consent to participate in a special arbitration ("Arbitration") for the exclusive purpose of arbitrating any Eligible Investor's consequential damages claim arising from their inability to sell Eligible Auction Rate Securities. Goldman Sachs shall have provided written notice to Eligible Investors of the terms of the Arbitration process on or before November 12, 2008.

28. The Arbitration shall be conducted by a single public arbitrator (as defined by section 12100(u) of the NASD Code of Arbitration Procedures for Customer Disputes, eff. April 16, 2007), under the auspices of FINRA. Goldman Sachs will pay all applicable forum and filing fees.

29. Any Eligible Investors who choose to pursue such claims in the Arbitration shall bear the burden of proving that they suffered consequential damages and that such damages were caused by their inability to access funds invested in Eligible Auction Rate Securities. In the Arbitration, Goldman Sachs shall be permitted to defend itself against such claims; provided, however, that Goldman Sachs shall not contest in these arbitrations liability related to the sale of auction rate securities or use as part of its defense any decision by an Eligible Investor not to borrow money from Goldman Sachs.

30. Eligible Investors who elect to use the special arbitration process provided for herein shall not be eligible for punitive or special damages, or for any other type of damages other than consequential damages.

31. Eligible Investors who elect to utilize the special arbitration process set forth above are limited to the remedies available in that process and may not bring or pursue a claim relating to Eligible Auction Rate Securities in another forum.

E. **Municipal Issuers**

32. Goldman Sachs shall promptly refund to municipal issuers refinancing fees paid to Goldman Sachs for the refinancing or conversion of their auction rate securities that occurred between February 11, 2008 and the date of this Assurance, where Goldman Sachs acted as underwriter for the initial primary offering of the auction rate securities between August 1, 2007 and February 11, 2008.

F. **Institutional Investors**

33. Goldman Sachs shall endeavor to work with issuers and other interested parties, including regulatory and governmental entities, to expeditiously provide liquidity solutions for institutional investors not covered by Section I.A. above that purchased auction rate securities from Goldman Sachs prior to February 11, 2008 ("Institutional Investors").

34. The Attorney General has refrained from taking legal action against Goldman Sachs with respect to Institutional Investors. The Attorney General shall issue continuances as it deems appropriate.

35. Beginning November 12, 2008 and within 45 days of the end of each Goldman Sachs fiscal quarter thereafter, Goldman Sachs shall submit to the Attorney General a written report outlining Goldman Sachs's progress with respect to its obligations pursuant to this Assurance. Goldman Sachs shall, at the option of the Attorney General, confer with the Attorney General on a quarterly basis to discuss Goldman Sachs's progress to date. Such quarterly reports and conferences shall continue until December 31, 2009. Following every quarterly report, the Attorney General shall advise Goldman Sachs of any concerns regarding Goldman Sachs' progress and, in response, Goldman Sachs shall discuss how Goldman Sachs plans to

address such concerns. The reporting or meeting deadlines set forth above may be amended with written permission from the Attorney General.

G. **Penalty and Remedial Procedures**

36. Goldman Sachs shall pay a civil penalty of TWENTY-TWO MILLION, FIVE HUNDRED THOUSAND DOLLARS ($22,500,000.00), of which $1,952,439.67 shall be paid to the State of New York no later than June 15, 2009, and the remainder to those states and territories that enter administrative or civil consent orders approving the terms of the North American Securities Administrators Association settlement in respect of all conduct relating to the marketing, sale and distribution of auction rate securities. The payment to the State of New York shall be in the form of a certified or bank check made out to "State of New York" and mailed to: Office of the Attorney General of the State of New York, 120 Broadway, 23rd Floor, New York, New York, 10271, Attn: David A. Markowitz, Chief, Investor Protection Bureau, or by wire.

37. Goldman Sachs agrees that it shall not, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to paragraph 36 above.

H. **Other Relief**

38. Goldman Sachs admits the jurisdiction of the Attorney General. Goldman Sachs will cease and desist from engaging in any acts in violation of the Martin Act, General Business Law § 349 and/or Executive Law § 63(12) and will comply with the Martin Act, General Business Law § 349 and Executive Law § 63(12).

## II. Other Provisions

39. The Attorney General retains the right under Executive Law § 63(15) to compel compliance with this Assurance. Evidence of a violation of this Assurance proven in a court of competent jurisdiction shall constitute prima facie proof of a violation of the Martin Act, General Business Law § 349 and/or Executive Law § 63(12) in any civil action or proceeding hereafter commenced by the Attorney General against Goldman Sachs.

40. Should the Attorney General prove in a court of competent jurisdiction that a material breach of this Assurance by Goldman Sachs has occurred, Goldman Sachs shall pay to the Attorney General the cost, if any, of such determination and of enforcing this Assurance, including without limitation legal fees, expenses and court costs.

41. If Goldman Sachs defaults on any obligation under this Assurance, the Attorney General may terminate this Assurance, at his sole discretion, upon 10 days' written notice to Goldman Sachs. Goldman Sachs agrees that any statute of limitations or other time related defenses applicable to the subject of the Assurance and any claims arising from or relating thereto are tolled from and after the date of this Assurance. In the event of such termination, Goldman Sachs expressly agrees and acknowledges that this Assurance shall in no way bar or otherwise preclude the Attorney General from commencing, conducting or prosecuting any investigation, action or proceeding, however denominated, related to the Assurance, against Goldman Sachs, or from using in any way any statements, documents or other materials produced or provided by Goldman Sachs prior to or after the date of this Assurance, including, without limitation, such statements, documents or other materials, if any, provided for purposes of

settlement negotiations, except as may otherwise be provided in a written agreement with the Attorney General.

42. Except in an action by the Attorney General to enforce the obligations of Goldman Sachs in this Assurance or in the event of termination of this Assurance by the Attorney General, neither this Assurance nor any acts performed or documents executed in furtherance of this Assurance: (a) may be deemed or used as an admission of, or evidence of, the validity of any alleged wrongdoing, liability or lack of wrongdoing or liability; or (b) may be deemed or used as an admission of or evidence of any such alleged fault or omission of Goldman Sachs in any civil, criminal, arbitration or administrative proceeding in any court, administrative agency or other tribunal. This Assurance shall not confer any rights upon persons or entities who are not a party to this Assurance.

43. Goldman Sachs shall cooperate fully and promptly with the Attorney General and shall use its best efforts to ensure that all the current and former officers, directors, trustees, agents, members, partners and employees of Goldman Sachs (and of any of Goldman Sachs' parent company, subsidiaries or affiliates) cooperate fully and promptly with the Attorney General in any pending or subsequently initiated investigation, litigation or other proceeding relating to auction rate securities and/or the subject matter of the Assurance. Such cooperation shall include, without limitation, and on a best efforts basis:

(a) production, voluntarily and without service of subpoena, upon the request of the Attorney General, of all documents or other tangible evidence requested by the Attorney General and any compilations or summaries of information or data that the Attorney General requests that Goldman Sachs (or the Goldman Sachs's parent companies, subsidiaries or affiliates) prepare, except to the extent

such production would require the disclosure of information protected by the attorney-client and/or work product privileges;

(b) without the necessity of a subpoena, having the current (and making all reasonable efforts to cause the former) officers, directors, trustees, agents, members, partners and employees of Goldman Sachs (and of any of the Goldman Sachs's parent companies, subsidiaries or affiliates) attend any Proceedings (as hereinafter defined) in New York State or elsewhere at which the presence of any such persons is requested by the Attorney General and having such current (and making all reasonable efforts to cause the former) officers, directors, trustees, agents, members, partners and employees answer any and all inquiries that may be put by the Attorney General to any of them at any proceedings or otherwise, except to the extent such production would require the disclosure of information protected by the attorney-client and/or work product privileges; "Proceedings" include, but are not limited to, any meetings, interviews, depositions, hearings, trials, grand jury proceedings or other proceedings;

(c) fully, fairly and truthfully disclosing all information and producing all records and other evidence in its possession, custody or control (or the possession, custody or control of the Goldman Sachs parent companies, subsidiaries or affiliates) relevant to all inquiries made by the Attorney General concerning the subject matter of the Assurance, except to the extent such inquiries call for the disclosure of information protected by the attorney-client and/or work product privileges; and

(d) making outside counsel reasonably available to provide comprehensive presentations concerning any internal investigation relating to all matters in the Assurance and to answer questions, except to the extent such presentations or questions call for the disclosure of information protected by the attorney-client and/or work product privileges.

44. In the event Goldman Sachs fails to comply with paragraph 43 of the Assurance, the Attorney General shall be entitled to specific performance, in addition to any other available remedies.

45. The Attorney General has agreed to the terms of this Assurance based on, among other things, the representations made to the Attorney General by Goldman Sachs, its counsel, and the Attorney General's own factual Investigation. To the extent

that any material representations are later found to be inaccurate or misleading, this Assurance is voidable by the Attorney General in its sole discretion.

46. Goldman Sachs shall, upon request by the Attorney General, provide all documentation and information reasonably necessary for the Attorney General to verify compliance with this Assurance.

47. To the extent applicable, this Assurance hereby waives any disqualification from relying upon the registration exemptions or registration safe harbor provisions that may be contained in the federal securities laws, the rules and regulations thereunder, the rules and regulations of self regulatory organizations or any states' or U.S. Territories' securities laws. In addition, this Assurance is not intended to form the basis for any such disqualifications. In addition, this Assurance is not intended to form the basis of a statutory disqualification under Section 3(a)(39) of the Securities Exchange Act of 1934.

48. All notices, reports, requests, and other communications to any party pursuant to this Assurance shall be in writing and shall be directed as follows:

If to Goldman Sachs:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attn: Stephanie G. Wheeler

If to the Attorney General:

Office of the Attorney General of the State of New York
120 Broadway, 23rd Floor
New York, New York 10271
Attn: David A. Markowitz

49. This Assurance and any dispute related thereto shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

50. Goldman Sachs consents to the jurisdiction of the Attorney General in any proceeding or action to enforce this Assurance.

51. Goldman Sachs agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in this Assurance or creating the impression that this Assurance is without factual basis. Nothing in this paragraph affects Goldman Sachs': (a) testimonial obligations; or (b) right to take legal or factual positions in defense of litigation or other legal proceedings to which the Attorney General is not a party. Nothing in this assurance shall be considered an admission of fraud.

52. This Assurance may not be amended except by an instrument in writing signed on behalf of all the parties to this Assurance.

53. This Assurance constitutes the entire agreement between the Attorney General and Goldman Sachs and supersedes any prior communication, understanding or agreement, whether written or oral, concerning the subject matter of this Assurance. No representation, inducement, promise, understanding, condition or warranty not set forth in this Assurance has been relied upon by any party to this Assurance.

54. In the event that one or more provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

55. This Assurance may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto.

56. Upon execution by the parties to this Assurance, the Attorney General agrees to suspend, pursuant to Executive Law § 63(15), this Investigation as and against Goldman Sachs solely with respect to its marketing and sale of auction rate securities to Eligible Investors.

57. Any payments and all correspondence related to this Assurance must reference AOD #AOD 08-177.

**WHEREFORE**, the following signatures are affixed hereto on the dates set forth below.

**ANDREW M. CUOMO,**
Attorney General of the State of New York

By: ______________________
David A. Markowitz
Chief, Investor Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8198

Dated: June 2, 2009

GOLDMAN, SACHS & CO.

By: ______________________
Norman Feit, Esq.
Managing Director

ACKNOWLEDGMENT

On this 1st day of June, 2009, before me personally came Norman Feit, known to me, who, being duly sworn by me, did depose and say that he is a Managing Director of Goldman, Sachs & Co., the entity described in the foregoing Assurance, and is duly authorized by Goldman, Sachs & Co. to execute the same, and that he signed his name in my presence by like authorization.

Norma A. Gerald

Notary Public
My commission expires:

NORMA A. GERALD
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GE6192086
Qualified in Kings County
My Commission Expires August 15, 2012

Assurance of Discontinuance
Reviewed By:

Stephanie G. Wheeler

*Attorneys for Goldman, Sachs & Co.*

Dated: June 1, 2009