UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                             :

Jonathan Farber,                          :
                             :

            Plaintiff,              :
                             :    10 Civ. 0873 (BSJ) (GWG)

               v.               :
                             :

Goldman Sachs Group, Inc. and      :    ECF CASE
Goldman Sachs & Co.,             :
                             :

           Defendants.         :
                             :
------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Nicole Gueron
Emily Reisbaum
CLARICK GUERON REISBAUM LLP
40 West 25th Street, 12th Floor
New York, NY 10010

David R. Lurie
Law Office of David R. Lurie
194 President Street
Brooklyn, N.Y. 11231

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES……………………………………………………………….....iii

PRELIMINARY STATEMENT…………………………………………………………….....1

FACTUAL BACKGROUND………………………………………………………………….....2

    I.    Farber Bought Goldman PARS Based On Its
         Misrepresentations and Omissions………………………………………………………2

    II.    The Auction Rate Securities Market Collapses, Proving that
          Goldman's PARS Were Not Cash Equivalents; Goldman Abruptly
          Reclassifies Them……………………………………………………………………….....4

    III. Goldman Knew Its Statements Were Materially False………………………………………...5

PROCEDURAL HISTORY………………………………………………………………….....7

ARGUMENT…………………………………………………………………………………8

I.    THE FINRA DECISION DOES NOT BAR FARBER'S SUIT…………………………………..8

II. FARBER HAS PLED A VIABLE FRAUD CLAIM……………………………………….....12

    A.    Farber Adequately Alleges Material Misrepresentations by Goldman…………………..13

        1.  Farber's Allegations Are Sufficiently Specific …………………………………………..13

        2.  Farber Adequately Alleges that Goldman's Representations Were False……………..14

    B.    Farber Alleges Goldman Acted With Scienter……………………………………………..17

        1.  Farber Adequately Alleges That Goldman Had Motive to Defraud…………………..18

        2.  Farber Adequately Alleges that Goldman Engaged in Conscious
            Misbehavior……………………………………………………………………………….....20

        3.  Goldman Fails To Proffer An Alternative, Equally Plausible,
            Innocent Explanation For Its Misstatements…………………………………………...21

## TABLE OF CONTENTS (CONT'D)

C.  Farber Adequately Alleges Reasonable Reliance on Goldman's
    Misrepresentations …………………………………………………………………....22

D.  Farber Adequately Alleges that Goldman Caused His Loss……………………………..23

CONCLUSION…………………………………………………………………………....25

## Table of Authorities

*Abbey v. 3F Therapeutics, Inc.*,
    2009 WL 4333819 (S.D.N.Y. Dec. 2, 2009) ........................................................................ 18

*Ashland Inc. v. Morgan Stanley & Co.*,
    2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010) ........................................................ 16, 20, 23

*Ashland, Inc. v. Oppenheimer & Co.*,
    2010 WL 672106 (E.D. Ky. Feb. 22, 2010) ................................................................ 13, 21

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................................... 25

*Bear, Stearns & Co. v. 1109580 Ontario, Inc.*,
    409 F.3d 87 (2d Cir. 2005)............................................................................................... 9, 12

*Cohen v. Morgan Keegan & Co., Inc.*,
    FINRA Case No. 08-03150 (Nov. 5, 2009) .................................................................. 10, 11

*Defer v. Raymond James Financial, Inc.*,
    654 F.Supp.2d 204 (S.D.N.Y. 2009)........................................................................ 14, 19-21

*DeMarco v. Lehman Bros. Inc.*,
    309 F. Supp. 2d 631 (S.D.N.Y. 2004)................................................................................... 23

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................................. 9, 12, 24

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)........................................................................................... 23-24

*Falls Church Group v. Tyler, Cooper & Alcorn*,
    912 A.2d 1019 (Conn. 2007) ................................................................................................ 17

*Ganino v. Citizens Utilites Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................................. 18

*Griffin v. Goldman Sachs & Co.*,
    2008 WL 4386768 (S.D.N.Y. Sept. 23, 2008).................................................................... 11

*Healthcare Finance Group, Inc. v. Bank Leumi USA*,
    2009 WL 3631036 (S.D.N.Y. Oct. 26, 2009)............................................................. 21, 24

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ............................................................................................ 8

*In re Ambac Financial Group, Inc. Sec. Litig.*,
    2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) .................................. 18, 20, 22, 25

*In re Citigroup Auction Rate Secs. Litig.*,
    2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) ........................................... 13, 24

*In re Merrill Lynch Auction Rate Secs. Litig.*,
    2010 WL 1257597 (S.D.N.Y. March 31, 2010) ...................................... 6, 24-25

*In re Reserve Fund Sec. and Deriv. Litig.*,
    2010 WL 685013 (S.D.N.Y. Feb 24, 2010) ........................................ 18, 19, 22

*Jacobs v. U.S. Anti-Doping Agency*,
    04 Civ. 1163 (BSJ), 2004 WL 5003951 (S.D.N.Y. May 19, 2004) .................... 8

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ........................................................................... 18

*Konkol v. Diebold, Inc.*,
    590 F.3d 390 (6th Cir. 2009) ......................................................................... 14

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006) ............................................................................. 3

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .................................................................................. 10-11

*Overton v. Todman & Co.*,
    478 F.3d 479 (2d Cir. 2007) ........................................................................... 17

*Pike v. Freeman*,
    266 F.3d 78 (2d Cir. 2001) ............................................................................... 9

*Rescuecom Corp. v. Google Inc.*,
    562 F.3d 123 (2d Cir. 2009) ........................................................................... 12

*Shapiro v. Cantor*,
    123 F.3d 717 (2d Cir. 1997) ........................................................................... 17

*Sullivan v. Ross*,
    CV075004195S, 2009 WL 3739479 (Conn. Super. Oct. 7, 2009). ................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................................12, 21

*Zischoltz v. Suntrust Banks, Inc.*,
    2009 WL 3132907 (N.D. Ga. Sept. 24, 2009) ...............................................................20-21

**Statutes**

Private Security Litigation Reform Act of 1995 (PSLRA),
    15 U.S.C. § 78u-4 (b)(1), (2) ...................................................................................13, 17-18

FINRA Rule 12504 .................................................................................................................7, 9, 11

Plaintiff Jonathan Farber, by his attorneys Clarick Gueron Reisbaum LLP and David Lurie, respectfully submits this memorandum of law in opposition to the motion to dismiss of defendants Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (together "Goldman").

## PRELIMINARY STATEMENT

Goldman falsely and intentionally told Farber that its auction rate securities were "cash equivalents;" those statements are fatal to its motion to dismiss this securities fraud suit. Goldman knew that its statements were false – the securities were *not* cash equivalents, they were part of an increasingly illiquid market that Goldman was desperately propping up with undisclosed bids. Goldman knew that Farber was purchasing these securities based on its false statements. This was securities fraud and Farber's claim against Goldman should proceed.

Farber was a Goldman customer who bought millions of dollars of "PARS," a Goldman service-marked auction rate security. From 2006 through 2008, Goldman told Farber – orally and in 22 written, monthly account statements – that its PARS were "cash equivalents," appropriate for short-term cash management and highly liquid for the singular reason that they were traded freely in periodic auctions. Relying on these representations, Farber bought an additional $1 million of Goldman PARS through an E*Trade account in May 2007.

Goldman's representations were false, and Goldman knew it. Even as it told Farber about the liquidity and safety of PARS, Goldman knew that its PARS auction markets were failing. Indeed, Goldman knew that the PARS auctions appeared to be functioning only because Goldman was propping them up with enormous proprietary purchases to compensate for the exodus of third-party, institutional investors from the PARS market. Goldman then made extensive efforts to sell its PARS inventory to unsuspecting individual investors like Farber. Goldman did not tell Farber any of this; instead, it told Farber over and over that its PARS were

"cash equivalents." Only after the PARS market collapsed did Goldman disclose the truth: that its PARS had become illiquid. But this was too late for Farber, who – as a result of Goldman's fraud – lost almost all the value of his $1 million investment. These facts state a valid claim for securities fraud under federal and state law, and under the common law.

Goldman's motion to dismiss ignores these damning facts, disingenuously asserting that a FINRA panel already has decided this fraud claim and unpersuasively likening this suit to failed auction rate securities ("ARS") claims. These defenses fail. First, Goldman's insistence that FINRA already decided the merits of Farber's securities fraud claim is unsupportable. The FINRA panel ruled only that, under a narrow procedural FINRA rule, Farber's claims against Goldman were not arbitrable; it did not reach the merits whatsoever. Second, unlike in other ARS cases – where claims failed because of vague factual allegations or claims against "downstream" broker defendants that did not run the ARS auctions as Goldman did – Farber's allegations are specific and direct, and establish that Goldman indisputably played the central, misleading role in his PARS purchases and the failure of the PARS auctions that harmed him.

Accordingly, the Court should deny the motion to dismiss.

## FACTUAL BACKGROUND

### I.     Farber Bought Goldman PARS Based On Its Misrepresentations and Omissions

Before the events relevant to this case, Farber had been a Goldman customer for several years. (Compl. ¶ 41.) He used his Goldman account for cash management, holding liquid and "cash equivalent" instruments that he could access easily to pay expenses, such as quarterly estimated taxes. (*Id.* ¶¶ 41-42.)

In or around 2006, Christine Mann, a Goldman salesperson with expertise in debt instruments, suggested to Farber that he replace some of his holdings with PARS, a Goldman

service-marked auction rate security.  (*Id.* ¶ 44.)[1]  She advised Farber that Goldman's PARS

performed like long-term bonds for issuers but like cash equivalents for purchasers.  (*Id.* ¶¶ 13-

15, 20, 45.)  Mann told Farber that PARS were appropriate for short-term cash management and

that there was minimal risk that they could become illiquid because of the structure of

Goldman's PARS auction system and the interest-rate provisions of the PARS.  (*Id.* ¶¶ 14, 20,

44-47.)  Mann explained that the risk of PARS becoming illiquid was highly remote because (1)

any auction failure for a particular PARS would likely be cured by the time of the next auction

through an increase in the security's yield; and (2) in the unlikely event of auction failure, high

auction-failure interest rate provisions would induce issuers to redeem the securities.  (*Id.* ¶ 46.)

        In the following months, Mann, Marla Stewart, and other Goldman sales team members

told Farber that *all* Goldman PARS were alike in cash equivalency and liquidity, and that Farber

could easily liquidate *all* Goldman PARS upon demand for cash needs.  (*Id.* ¶ 47.)  Farber relied

on this advice and delegated to Goldman the authority to choose and purchase PARS for him.

(*Id.*)  Goldman bought millions of dollars of its PARS for Farber in 2006 and 2007.  (*Id.* ¶ 50.)[2]

        Goldman repeatedly and specifically confirmed its oral representations about the liquidity

and cash equivalence of its PARS in the written monthly account statements it sent to Farber.

For 22 consecutive months, from April 2006 to January 2008, Farber's statements identified his

Goldman PARS as "cash equivalents," listed in a category of holdings labeled "Cash and Cash

Equivalents."  (*Id.* ¶¶ 48-49; Gueron Decl. Ex. A.)  "Cash equivalent" need hardly be defined,

---

[1] The Goldman sales people who spoke with Farber are identified by name on his account statements and listed as "Your Goldman Sachs Team." (Gueron Decl. Ex. A (Redacted Account Statements of J. Farber, dated Apr. 2006 to Oct. 2008).) The account statements are referred to in the Complaint and incorporated by reference. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).

[2]  This Suit does not concern the Goldman PARS Farber bought and held in his Goldman account because Goldman bought those back from Farber at par pursuant to its June 7, 2009 settlement with the New York Attorney General (the Assurance of Discontinuance ("AOD"), attached to the Complaint).

3

but of course it means those "investments or securities of such high liquidity and safety that they are regarded as good as cash . . . ." (Gueron Decl. Ex. B (excerpting Barron's Dictionary of Banking Terms at 77).) Goldman's account statements placed PARS within this widely accepted definition; the "Cash and Cash Equivalents" category listed PARS with cash, money market fund shares, and short-term Treasury securities. (*See, e.g.,* Gueron Decl. Ex. A (Feb. 2007 statement).)

In 2007, Farber also had an account at E*Trade, a discount brokerage. (Compl. ¶ 50.) On or around May 29, 2007, an E*Trade salesman solicited Farber to buy a Goldman PARS issued by the Massachusetts Health and Education Facilities Authority ("HEFA"): Children's Hospital Series I, dated May 31, 2001, due October 1, 2040, CUSIP 57585KQWI. (*Id.* ¶ 52.) In reliance on Goldman's repeated statements to him orally and in writing – namely, that *all* of its PARS were cash equivalents and equally liquid – Farber bought $1 million of the HEFA-issued Goldman PARS on May 29, 2007. (*Id.* ¶¶ 47, 52-53.)

From May 2007 through February 2008, when Farber held PARS in both his Goldman and E*Trade accounts, he continued to receive monthly account statements from Goldman touting its PARS as cash equivalents. (*Id.* ¶ 54; Gueron Decl. Ex. A.)

## II.    The Auction Rate Securities Market Collapses, Proving that Goldman's PARS Were Not Cash Equivalents; Goldman Abruptly Reclassifies Them

On February 13, 2008, the market for PARS failed. (Compl. ¶ 56-57.) It failed because, unbeknownst to Farber, Goldman had been propping up the PARS auctions artificially with their own purchases, and then stopped doing so. (*Id.*; AOD ¶ 13.) As soon as Goldman's artificial measures ceased, the PARS market collapsed: indeed, 87% of all ARS auctions failed in a few days. (Compl. ¶ 56-57.) Farber's $1 million Goldman PARS became totally illiquid and unsellable. (*Id.* ¶ 57.)

In Farber's next account statement, for the first time Goldman admitted that its PARS are

4

*not* "cash equivalents." (Gueron Decl. Ex. A.)  In the account statement for the period ending February 29, 2008, Goldman listed its PARS in a new category: "Cash, Cash Equivalents and Auction Rate Securities." (*Id.*)  The next month, in the statement for the period ending March 31, 2008, Goldman admitted that its PARS "may be considered to be illiquid, particularly if they have been subject to a failed auction." (*Id.*)  Then, in the statement for the period ending April 30, 2008, Goldman conceded that "there is no guarantee that there will be liquidity" with PARS, there is "no assurance that a secondary market will develop or that the security will continue to trade at par," and "the securities may be considered illiquid, particularly if they have been subject to a failed auction." (Compl. ¶¶ 59-61; Gueron Decl. Ex. A.)  Finally, in the statement for the period ending October 31, 2008, Goldman dropped all pretense and recategorized its PARS as "Investment Grade Fixed Income." (*Id.*)

After years of misrepresenting to Farber that Goldman PARS were "cash equivalents," Goldman reversed course and admitted that its PARS were illiquid. (Compl. ¶¶ 58-61.)  As the Attorney General noted, Goldman's earlier representations were "misleading." (AOD ¶ 7.)

But these admissions came too late for Farber, who now holds a wholly illiquid PARS, which is paying an interest rate far below what Farber had been told by Goldman to expect, and which will not mature until 2040. (Compl. ¶¶ 67-69.)  Farber is effectively making HEFA a $1 million near-interest-free loan for the next 30 years. (*Id.*)

## III.  Goldman Knew Its Statements Were Materially False

The collapse of the PARS market was no surprise to Goldman. (Compl. ¶¶ 24-32.)  PARS were a Goldman brand, that Goldman itself developed and marketed. (*Id.* ¶¶ 18-20.)  Goldman underwrote PARS for issuers nationwide and managed the periodic auctions for many of the issues it underwrote. (*Id.*; Gueron Decl. Ex. C (Goldman PARS Official Statement).)

Starting at least in 2005, Goldman knew that its PARS auctions were endangered by the exit of institutional investors from the market due to changes in the accounting treatment of ARS. (*Id.* ¶¶ 16, 24-25; Stewart Decl. Ex. 1 ¶¶ 39-42.) Throughout 2006 and 2007, institutional investors continued exiting the PARS market, jeopardizing PARS liquidity as the market of potential bidders at auction narrowed. (Compl. ¶ 16, 27; AOD ¶ 10.) In 2007 and 2008, Goldman knew that losing the institutional customer base was straining the PARS market to the point of non-viability and that the ARS market "faced dislocation and an increased risk of auction failure." (Compl. ¶ 27; AOD ¶¶ 7, 12.)

But Goldman did not disclose these risks to Farber in 2006, 2007, or early 2008. (*Id.* ¶ 12.) Never advising Farber that the PARS market was seizing up, Goldman continued to send account statements identifying Goldman PARS as "cash equivalents." (Gueron Decl. Ex. A.) Goldman concealed the PARS market crisis by placing increasing numbers of its own bids in the PARS auctions it managed, creating an artificial and misleading impression of PARS liquidity. (Compl. ¶ 29; AOD ¶ 11.) Goldman placed these bids secretly to replace the lost institutional bidders and to keep investors like Farber unaware that the liquidity of Goldman's PARS now depended entirely on Goldman's unilateral power to continue or cease making those bids. (AOD ¶ 9, 11.) Yet, without other bidders, Goldman's PARS auctions were no longer auctions; they were simply Goldman's own, unilateral, voluntary purchases or sales. (Compl. ¶¶ 28-29.)

Any effort by Goldman to analogize this misconduct to "cover bids" it historically had made to prevent market anomalies is disingenuous. After a 2006 SEC investigation and settlement,[3] Goldman was required to disclose that, to prevent auction failure when a *particular* auction suffered from insufficient bidders or drew below-market bids, Goldman would "routinely

---

[3] Courts have taken judicial notice of this settlement and subsequent disclosures. *See, e.g., In re Merrill Lynch Auction Rate Secs. Litig.*, 2010 WL 1257597, at *4 n.4 (S.D.N.Y. March 31, 2010).

place one or more Bids in an auction for [its] own account." (Gueron Decl. Ex. D at 6.)

Goldman's stated purpose for this practice was to ensure that its auctions "reflect" the actual

state of the "market for the securities," *i.e.,* a normal course market making function. *Id.* Here,

Farber alleges a totally different scenario – by 2007 and 2008, Goldman's bids propping up the

PARS market did not "reflect" the actual market because there was no actual market; Goldman's

undisclosed sales and purchases had entirely replaced it.

Goldman's bids also generated a ballooning inventory of PARS on its books. (Compl. ¶

32.) That inventory exceeded Goldman's internal risk management rules, forcing the firm to

waive its risk limits. (*Id*; AOD ¶ 11.) Burdened by this excessive PARS inventory, Goldman

began to unload its excess PARS on retail customers like Farber (Compl. ¶¶ 38-39), which

required it to perpetuate its false statements that its PARS were cash equivalents.

After the ARS market froze, the New York Attorney General investigated Goldman and

required it to buy back approximately $1 billion of ARS from its customers. (Compl. ¶ 63; AOD

*passim*.) Goldman bought back all the PARS that Farber held in his Goldman account and the

HEFA-issued PARS other Goldman customers held in their Goldman accounts. (*Id.* ¶ 64;

Stewart Decl. Ex. 1 ¶ 83.) But because Farber holds his HEFA-issued PARS in an E*Trade

account, Goldman refused to buy it back. (Compl. ¶¶ 65-66.)

## PROCEDURAL HISTORY

On April 28, 2009, Farber filed a claim against Goldman and E*Trade before FINRA.

(Stewart Decl. Ex. 1.) Goldman requested that FINRA decline jurisdiction over the claim,

arguing that the claim was non-arbitrable; the FINRA director denied this request. (*Id.* Ex. 5.)

Goldman tried again – it moved to dismiss Farber's claims on arbitrability grounds under FINRA

Rule 12504(a)(6)(B), arguing to the FINRA panel, in a brief that Goldman declined to provide to

this Court, that it could disregard the FINRA Director's decision because:

> As was the situation in the *Cohen* FINRA arbitration, the Director denied
> [Respondent's] similar request, yet the Panel found that such a ruling "did
> not preclude Respondents from filing their motion to dismiss because by
> his ruling, the Director did not determine all of the same issues raised in the
> motion but, in effect merely denied Respondents' request to not arbitrate
> Claimants' claims, *leaving the determination of arbitrability to the panel*."

(Gueron Decl. Ex. E (Respondent Goldman, Sachs & Co.'s Reply In Support of Its Motion to

Dismiss, Dec. 14, 2009) at 1-2) (emphasis added).)

On December 18, 2009, the FINRA panel granted Goldman's motion to dismiss, ruling

that Goldman was not connected or associated with Farber's E*Trade account; Farber had not

purchased the PARS from Goldman; Goldman "did not have any knowledge or control or was

involved" in Farber's purchase of the PARS; and Farber had not held the PARS in a Goldman

account. (Stewart Decl. Ex. 9 (the "FINRA Decision").) The FINRA decision did not address

any fact or legal issue relevant to Farber's securities fraud claim. (*Id.*)

## ARGUMENT

## I.    THE FINRA DECISION DOES NOT BAR FARBER'S SUIT

Goldman's estoppel arguments share a common fatal flaw – the incorrect assertion that

the FINRA panel ruled against Farber on the merits of his claim. Because the FINRA panel did

no such thing, and ruled only on the arbitrability of Farber's claim, this suit should proceed.[4]

As Goldman concedes, the doctrines of *res judicata* and collateral estoppel cannot bar

this suit unless Farber previously obtained a final decision on the merits of his securities fraud

---

[4] Arbitrability is a non-substantive question that precedes a merits-based review. *See Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002) ("[O]ne might call any potentially dispositive gateway question a 'question of arbitrability,' for its answer will determine whether the underlying controversy will proceed to arbitration on the merits"); *Jacobs v. U.S. Anti-Doping Agency,* 2004 WL 5003951, at *3 (S.D.N.Y. May 19, 2004) (citing cases distinguishing between arbitrability and decisions on the merits), *aff'd sub nom. Jacobs v. USA Track & Field,* 374 F.3d 85 (2d Cir. 2004).

claims. *See Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (arbitration decision provides collateral estoppels basis only if identical issue was raised and decided in previous proceeding and was necessary to decision on merits); *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001) (*res judicata* applies only after adjudication on merits). Because there was no decision on the merits here, *res judicata* and collateral estoppel cannot apply.

Three independent reasons establish that the FINRA Decision was not on the merits. The first is the language of the Decision itself. (Stewart Decl. Ex. 9.) Farber charged Goldman with securities fraud, with its familiar elements:  (1) a material misrepresentation or omission; (2) scienter, *i.e.*, an intent to deceive or defraud; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). But the FINRA Decision does not discuss any of these elements. It includes no analysis of Goldman's fraudulent misrepresentations, of Goldman's *scienter*, of whether Farber relied on the misrepresentations, or of the cause of his losses. (Stewart Decl. Ex. 9.) The word "fraud" does not appear in the decision, and the factual findings in the decision track (albeit incompletely) an entirely different standard:  the arbitrability test of FINRA Rule 12504. (*Id.*) The FINRA panel analyzed whether Goldman was in privity with Farber as to the Goldman PARS, whether Farber held the Goldman PARS in a Goldman account, and other questions of fact relevant to a Rule 12504 arbitrability analysis, but utterly irrelevant to a securities fraud claim. (*Id.*) Goldman's claim that the FINRA Decision resolves the merits of Farber's securities fraud claim is contrary to the panel's stated rationale.

Second, FINRA Rule 12504, a new and non-substantive rule governing the arbitrability of certain claims, confirms that the FINRA Decision was not on the merits. Rule 12504(a)(6) permits a motion to dismiss only if "the panel determines that: . . . (B) the moving party was not

9

associated with the account(s), security(ies), or conduct at issue." FINRA repeatedly has stated that this rule applies in narrow, non-substantive situations. (Gueron Decl. Ex. F, Regulatory Notice 09-07 at 5 ("FINRA intends this exception to apply in cases involving issues of misidentification"); 74 Fed. Reg. 731, 736 (Jan. 7, 2009) (FINRA "intends this exception to apply narrowly, such as in cases involving issues of misidentification . . . if, for example, a party files a claim against the wrong person or entity. . . .").) There is no basis to read a Rule 12504 decision as a substantive dismissal of a securities fraud claim unless the panel expressly includes a merits analysis, as it did in the main case Goldman cited to the FINRA panel: *Cohen v. Morgan Keegan & Co., Inc.*, FINRA Case No. 08-03150, at 2-3 (Nov. 5, 2009) (Rule 12504 analysis supplemented by alternative merits analysis of securities fraud claim) (Gueron Decl. Ex. E). Here, unlike in *Cohen*, the FINRA Decision includes no merits analysis, and Goldman's rhetoric to the contrary should be rejected.

The third basis for concluding that the FINRA Decision is based on arbitrability, not the merits, is that Goldman expressly framed the issue that way for the FINRA Panel. Although Goldman disingenuously claims that it argued the merits before FINRA (Def. Br. 8), in its reply brief filed with the FINRA panel, but not provided to this Court, Goldman urged the FINRA panel to rule on the arbitrability of Farber's claim, *not the merits*. (Gueron Decl. Ex. E at 1-2.) Specifically, Goldman asserted that it could reargue arbitrability, despite the FINRA Director's denial of Goldman's initial objection, because, as in *Cohen*, the director left the "determination of arbitrability to the panel." (*Id.*) Having asked the FINRA Panel to decide arbitrability, and having obtained the ruling it sought, Goldman is judicially estopped from arguing here that the FINRA Decision was on the merits of Farber's securities fraud claim. *See New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001) (judicial estoppel prohibits parties from prevailing based on

10

position in one phase of case, then asserting contradictory position later).

Judicial estoppel also precludes Goldman's reliance on its client agreement with Farber as a basis for avoiding this Court's jurisdiction. (Def. Br. 3.) Before FINRA, Goldman argued that the client agreement was inapplicable because it "provides for arbitration only with respect to transactions in his Goldman account, and not to transactions he may have had at other firms such as E*Trade." (Stewart Decl. Ex. 3 at 6-7.) Now, having prevailed below on that very distinction, Goldman argues the exact opposite – that the agreement requires the parties to arbitrate. (Def. Br. 3.) The Court should reject this gamesmanship.

Moreover, the cases Goldman cites offer it no support; rather, they prove Farber's case. Goldman relies heavily on *Sullivan v. Ross* for the proposition that a merits-based finding should be inferred from FINRA's grant of a motion to dismiss. (Def. Br. 8; *Sullivan v. Ross*, 2009 WL 3739479 (Conn. Super. Oct. 7, 2009).) But in *Sullivan*, "the arbitrator cite[d] no grounds for dismissal" and therefore "there [was] nothing to indicate that [the arbitrator] did not reach the merits of the claims." *Id.* at *1. Here, by contrast, the FINRA panel issued a reasoned decision that articulated the precise bases (and there were seven of them) for its ruling – all narrow, procedural grounds set out by Rule 12504. Nothing in *Sullivan* supports converting the FINRA panel's narrow, procedural decision into a merits ruling.

*Griffin v. Goldman Sachs & Co.,* 2008 WL 4386768 (S.D.N.Y. Sept. 23, 2008) (Def. Br. 10) also does not assist Goldman. That court denied an initial motion to stay arbitration, ruling that the terms of an arbitration agreement required a FINRA panel to adjudicate the defendants' timeliness defense. *Id.* at *2. After the FINRA panel found the case time-barred and dismissed it, the plaintiff filed a new court action, again asking the court to adjudicate the timeliness issue.

*Id.* Unsurprisingly, the Court dismissed the action, reasoning that it already had ruled that the arbitration agreement bound the parties to the FINRA panel's decision. *Id.* at *4.

Here, by contrast, there has been no decision on the merits, nor any determination that Farber and Goldman must resolve their dispute before FINRA. To the contrary, the FINRA panel decided exactly otherwise, determining – at Goldman's behest – that Farber's claim against Goldman was non-arbitrable for procedural reasons. (Stewart Decl. Ex. 9.)

Goldman's argument that Farber cannot collaterally attack the FINRA Decision (Def. Br. 6-7) is equally flawed. Farber is not asking this Court to vacate or overturn the FINRA Decision; he seeks a ruling on the undecided merits of his securities fraud claim. *Bear, Stearns*, 409 F.3d at 91 (no estoppel if arbitration decision not on identical issue, necessary to decision on merits).

Thus, the FINRA Decision, which was not on the merits, cannot bar Farber's suit.

## II.   FARBER HAS PLED A VIABLE FRAUD CLAIM

Farber states a claim of securities fraud. The elements of securities fraud under Section 10(b) are well settled: (1) a material misrepresentation or omission; (2) scienter, *i.e.,* an intent to deceive or defraud; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms.*, 544 U.S. at 341-42. On a Rule 12(b)(6) motion to dismiss a securities fraud claim, the Court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "draw inferences from th[e] allegations in the light most favorable to plaintiff, and construe the complaint liberally," *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). Farber meets the threshold for stating a claim easily.[5]

---

[5] Because the standards under Connecticut securities law and common law fraud closely track federal securities law in relevant part, those claims have been adequately pled as well, as shown in this Point II.

### A.   Farber Adequately Alleges Material Misrepresentations by Goldman

#### 1.   Farber's Allegations Are Sufficiently Specific

The Private Security Litigation Reform Act of 1995 (15 U.S.C. § 78u-4 (b)(1), (2) (the "PSLRA")) requires a plaintiff to specify the material misstatements underlying a claim and "the facts 'on which [a] belief that a statement is misleading was 'formed.'" *Dura Pharms.*, 544 U.S at 345.  Farber does exactly that.

Goldman asserts that "Mr. Farber hinges his claim on his conclusory contention that Goldman told customers at some unspecified point and manner that ARS were secure, liquid securities, and cash alternatives." (Def. Br. 13.)  This boilerplate is wrong.  Farber alleges that Goldman sent him 22 written, dated, monthly account statements that falsely identified its PARS as "cash equivalents." (Compl. ¶¶ 48-49.)  The statements listed Goldman PARS in a category labeled "Cash and Cash Equivalents" that included cash holdings and highly liquid securities such as Treasury bonds. (Compl. ¶¶ 48-49; Gueron Decl. Ex. A.)  Goldman sent these statements to Farber every month prior to his May 2007 purchase of the Goldman PARS, and after, until the PARS market collapsed. (*Id.*)  There is nothing "conclusory" or "unspecified" about these allegations, and no case Goldman cites proves otherwise. *See Ashland, Inc. v. Oppenheimer & Co.,* 2010 WL 672106 (E.D. Ky. Feb. 22, 2010) (no written account statements calling ARS "cash equivalents" before plaintiff purchased securities); *In re Citigroup Auction Rate Secs. Litig.*, 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) (same).

Further, Farber specifically describes the oral misrepresentations that the Goldman sales team made in the months before he bought the Goldman PARS.  He alleges that Mann (a purported debt specialist), Stewart, and other Goldman sales team members represented to him that all Goldman PARS were highly liquid and appropriate for cash management purposes.

13

(Compl. ¶¶ 44-47.) Mann and others on the Goldman sales team repeatedly assured Farber that the risk of their "cash equivalent" PARS becoming illiquid was highly remote, because (i) in the rare and unlikely event of an auction failure for a particular PARS issuance, the problem would be cured before the next scheduled auction through an increase in the yield; and (ii) even if there was an ongoing auction failure, the supposedly high auction failure rate provisions applicable to all PARS would induce issuers to redeem the securities. (*Id.*) Farber alleges that Mann, Stewart, and others on Goldman's sales team assured him that all of its PARS shared the same attributes of cash equivalency and liquidity. (*Id.* ¶ 47.) These allegations satisfy the PSLRA particularity standards. *See Defer v. Raymond James Financial, Inc.*, 654 F. Supp.2d 204, 212-13 (S.D.N.Y. 2009) (allegations that financial advisor told plaintiff ARS were cash equivalents sufficiently particular against advisor and employer).

Further, as detailed in the AOD, the New York Attorney General found that Goldman likewise assured countless other customers "that auction rate securities were secure, liquid securities that were a suitable alternative for cash management purposes." (AOD ¶ 6.) Goldman cannot credibly contend that it lacks sufficient notice and specificity regarding the misrepresentations at issue, having agreed in a regulatory settlement to repurchase $1 billion of securities from its customers (including Farber) based on identical misrepresentations.[6]

### 2.  Farber Adequately Alleges that Goldman's Representations Were False

Farber adequately alleges the material falsity of Goldman's statements. The starting point for this analysis is the PARS market in May 2007, when Farber purchased the Goldman PARS. By that time, unbeknownst to purchasers like Farber, the market for all of Goldman's

---

[6]  Goldman's reliance on *Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009), to criticize Farber's use of the AOD is misplaced. In *Konkol*, plaintiff alleged only the existence of a DOJ/SEC investigation. *Id.* at 401-02. Here, Farber relies on the Attorney General's post-investigation findings of fact, set forth in the AOD, to plead his claims, not the mere fact that Goldman was the subject of an investigation.

14

PARS had already eroded critically.  (Compl. ¶¶ 24-32; AOD ¶¶ 6-9.)  The institutional investors

that had anchored the PARS auctions had exited the market and were not returning.  (Compl. ¶¶

24-26.)  Goldman recognized that these departures had left its PARS market so "strain[ed]" that

the very "viability" of the auction system – and thus the liquidity and value of the underlying

securities – was increasingly at risk.  (Compl. ¶ 27; AOD ¶ 12.)

   Had Goldman been truthful, it would have disclosed to Farber and its other customers

that its PARS auctions were no longer true auctions – the third parties essential to sustaining the

liquidity of Goldman's PARS had stopped buying PARS – and Goldman was single handedly

supporting the auctions with enormous proprietary purchases.  Instead, Goldman covered up the

truth, told Farber that its PARS were liquid cash equivalents, and concealed the non-viability of

its PARS market.  (Compl. ¶¶ 27-32; AOD ¶ 11.)  Goldman's repeated misrepresentations that

PARS were cash equivalents were materially false.

   Only after the February 2008 collapse of its PARS market did Goldman admit the truth

and recategorize its PARS as non-cash equivalents.  After 22 months of describing Goldman

PARS as "cash equivalents," Farber's account statement for the period ending February 29,

2008, for the first time placed them in a new category titled "Cash, Cash Equivalents and

Auction Rate Securities."  (Compl. ¶¶ 59-61; Gueron Decl. Ex. A.)  In the succeeding months

Goldman made a dribbling series of admissions, until by October 2008, Goldman dropped all

pretense and simply recategorized its PARS as "Investment Grade Fixed Income."  (Gueron

Decl. Ex. A.)  These corrective disclosures alone establish the falsity of Goldman's prior

representations that its PARS were cash equivalents.

   Goldman implies that it should be excused from liability because Farber's allegations

concern the PARS market generally, not misrepresentations specific to the HEFA-issued

15

Goldman PARS. (Def. Br. 13.)  But Goldman expressly told Farber that *all* of its PARS were cash equivalents, which plainly encompasses the HEFA-issued PARS. (Compl. ¶ 47; Gueron Decl. Ex. A.)  Further, no rule of securities law immunizes defendants for misrepresentations about an entire securities product line where the misrepresentations encompass a single issue within that line.  Indeed, the SEC has brought numerous enforcement actions regarding misrepresentations in the ARS markets that were not limited to particular ARS issues, including the 2006 enforcement action against Goldman regarding its PARS. *See* http://www.sec.gov/news/press/2006/2006-83.htm (listing entities that settled in 2006).

Nor can Goldman argue on reply (for the first time) that it disclosed its fraudulent conduct to Farber.  Goldman's disclosed "cover bids" were to prevent market anomalies, to prevent a particular auction from failing and to ensure that its auctions "reflect[ed]" the actual state of the "market for the securities," *i.e.*, a normal course market making function. (Gueron Decl. Ex. D at 6.)  This disclosure does not encompass the fraud alleged here.  Goldman's conduct with regard to its PARS was not designed to ensure that the price and yield of PARS "reflect[ed] the market;" rather, it was designed to hide the fact that the market had stopped functioning. (Compl. ¶¶ 27-32; AOD ¶ 9, 11.)[7]  Goldman's published disclosure cannot shield it from liability, because it disclosed a fundamentally different scenario.[8]

---

[7] The SEC has not viewed this prior disclosure as protecting ARS auction managers; rather, like the New York Attorney General, the SEC charged ARS auction managers who engaged in the same misconduct at issue here with securities fraud.  *See, e.g.*, http://www.sec.gov/news/press/2006/2006-83.htm (listing entities that settled in 2006); http://sec.gov/news/press/2008/2008-168.htm (Citigroup 2008 settlement), http://www.sec.gov/news/digest/2008/dig081508.htm (Wachovia 2008 settlement).

[8] Farber's allegations of false statements are critically different from those at issue in *Ashland Inc. v. Morgan Stanley & Co.*, 2010 WL 1253932 (S.D.N.Y. Mar. 30, 2010).  In *Ashland*, plaintiffs alleged Morgan Stanley had promised to continue to "make the market" in ARS indefinitely and "would not allow an auction to fail." *Id.* at *2.  Farber does not allege that Goldman made any such promise; he alleges Goldman failed to disclose that its PARS auctions were a sham.

\*        \*        \*

Goldman is also liable for fraud based on its material omissions – it failed to disclose that the viability of the PARS market was fatally impaired. Under federal securities law, a defendant owes a duty of disclosure where "when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Shapiro v. Cantor*, 123 F.3d 717, 721 (2d Cir. 1997) (citations omitted); *accord Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007); *see also Falls Church Group v. Tyler, Cooper & Alcorn*, 912 A.2d 1019, 1034 (Conn. 2007) (quotation omitted) ("[a] fiduciary or confidential relationship [under Connecticut law] is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . ." Where one party to a business relationship has superior knowledge, it may bear a fiduciary duty of disclosure even where the counter-party is otherwise sophisticated. *Id.* Goldman owed such a duty here, first, because Farber had delegated to Goldman discretion to select which PARS to buy for his Goldman account (Compl. ¶ 47), and, second, because Goldman had superior (indeed unique) knowledge of the impairment of the PARS auction markets. Goldman had an affirmative obligation to disclose that PARS were no longer cash equivalents because it was – for now –single handedly preventing the PARS market from collapsing.

### B.      Farber Alleges Goldman Acted With Scienter

Under the PSLRA, a viable scienter allegation must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'" *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citation

17

omitted).  To meet this test, a plaintiff may plead *either* facts establishing that the defendant had "motive and opportunity" to commit a fraud *or* facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* at 168-69.  This long-standing Second Circuit test is consistent with the *Tellabs* holding that the PSLRA requires an inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged."  *In re Ambac Fin. Group, Inc. Sec. Litig.*, 2010 WL 727227, at *17 (S.D.N.Y. Feb. 22, 2010) (quoting *Tellabs,* 551 U.S. at 324).  Farber satisfies these tests here.

### 1.    Farber Adequately Alleges That Goldman Had Motive to Defraud

Farber alleges that Goldman had a specific, substantial motive to defraud him – the need to protect its PARS enterprise and to unload its huge inventory of PARS before the market collapsed.  This alone establishes the requisite strong inference of fraudulent intent.

"Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'"  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted).  Thus, while generic motives such as a general interest in generating fees or income cannot satisfy the PSLRA, an inference of fraud is established if a plaintiff alleges a specific financial interest in committing fraud, including to avoid a large financial loss.  *See In re Reserve Fund Sec.*, 2010 WL 685013, at *7 (S.D.N.Y. Feb 24, 2010) (defendants' risk to reputation and of losing financial stake satisfies scienter requirements); *Abbey v. 3F Therapeutics, Inc.*, 2009 WL 4333819, at *11 (S.D.N.Y. Dec. 2, 2009) (needing plaintiff's investment to maintain operations is sufficient motive for scienter requirements).

Farber alleges adequately Goldman's motive to mislead him into purchasing Goldman PARS.  (Compl. ¶¶ 32, 37-38; AOD ¶ 8.)  Goldman had backed itself into a corner – its proprietary PARS holdings had grown enormously in the year leading up to the collapse of the

18

PARS market, due to its efforts to prop up its failing PARS auctions. (*Id.* ¶¶ 8, 11.) Goldman waived its internal risk management guidelines in order to continue this proprietary bidding. (Compl. ¶ 32; AOD ¶ 11.) After accumulating this inventory, and recognizing that the PARS market was no longer viable, Goldman faced huge risk – and had ample motive to unload as much of its proprietary PARS as possible before the PARS market collapsed. (Compl. ¶¶ 33-39; AOD ¶ 11.) Goldman did that by misrepresenting PARS to customers like Farber. (*Id.*)

Goldman contends that these detailed motive allegations are too vague to satisfy the PSLRA. (Def Br. 13-15.) But the case law is otherwise. This Court recently upheld a securities fraud suit against the managers of a mutual fund that made misrepresentations to conceal that the fund was on the verge of collapse, reasoning that the fund managers' interest in preserving their enterprise was ample to support an inference of scienter. *See Reserve Fund,* 2010 WL 685013, at \*7. Similarly, here, Goldman knew that any indication of non-liquidity or auction failure would jeopardize its entire PARS enterprise.

Even one of the cases Goldman relies on demonstrates that Farber's motive allegations are sufficient. In *Defer*, 654 F. Supp.2d at 206-08, plaintiff sued three affiliated entities, including an investment banking company that managed ARS auctions and a retail brokerage company that sold ARS to customers. Like Goldman, the investment bank had run sham ARS auctions and had thereby accumulated large inventories of ARS. The court held that the motive alleged – "to unload their excess and soon to be illiquid ARS inventory on unsuspecting customers" – was potentially cognizable, and not generic. *Id.* at 218. The claim failed only because it was the broker, not the auction manager, that had sold and misrepresented the ARS to the plaintiffs; since the broker did not itself hold the proprietary ARS, the Court would not ascribe the auction manager's motive to the broker. *Id.*

19

Goldman has no such defense here. One entity – Goldman Sachs & Co. – did it all: made material misrepresentations to Farber, underwrote PARS issuances, ran and bid in the PARS auctions, and held the huge PARS inventory that it sought to unload. (AOD, *passim*; Gueron Decl. Ex. D.) Under *Defer*'s stated rationale, the Court should sustain the Complaint.[9]

**2.      Farber Adequately Alleges that Goldman Engaged in Conscious Misbehavior**

Alternatively, and equally sufficiently, Farber satisfies the scienter requirements by alleging that by 2006 and 2007, Goldman knew that its PARS were not cash equivalents. (Compl. ¶¶ 25, 27, 49, AOD ¶ 7, 9.) Farber alleges (and the New York Attorney General found) that Goldman knew that it was propping up its PARS auctions to create a false appearance of liquidity and unloading its PARS through retail brokers like E*Trade, yet it continued to tell Farber his PARS were cash equivalents. (*Id.*) A defendant with private knowledge that contradicts its public statements presents strong circumstantial evidence of conscious misbehavior or recklessness. *See Ambac*, 2010 WL 727227, at *21.

Again, the cases Goldman relies upon are inapposite. For instance, *Zischoltz* involved a "downstream" ARS seller, that – unlike Goldman – did not manage ARS auctions or conduct sham ARS auctions. *See Zischoltz v. Suntrust Banks, Inc.,* 2009 WL 3132907 (N.D. Ga. Sept. 24, 2009). The *Zischoltz* plaintiffs alleged only a "weak and convoluted" inference that this "downstream" defendant knew that auction managers at other firms were engaged in misconduct

---

[9] *Ashland*, 2010 WL 1253932, at *11, is not to the contrary. In *Ashland*, the court rejected plaintiff's motive allegations, deeming it "economically irrational" for Morgan Stanley to buy into an "already illiquid" ARS auction market "in order to induce Ashland" to buy ARS. *Id.* But Farber does not allege that Goldman bought into an "already illiquid" market; he alleges that Goldman's enormous PARS holdings developed over time, as Goldman unilaterally propped up PARS auctions so that it could preserve its PARS enterprise and exit the market; this is a "Ponzi-type scheme" that the *Ashland* court acknowledged would be "adequate motive" to establish scienter. *Id.*

or that the ARS auction market was in peril. *Id*. at *5. Here, by contrast, Goldman's knowledge is squarely alleged because it ran the disputed sham auctions until the market, as a result of Goldman's own actions, predictably collapsed. Accordingly, while the collapse that followed the termination of the PARS auction scheme might have been "unexpected" for the downstream broker defendant in *Zischoltz* (Def. Br. 14.), the same cannot be said for Goldman.

Most of the other cases Goldman cites likewise involve downstream firms, and are thus irrelevant here. *See, e.g., Oppenheimer,* 2010 WL 672106; *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp.2d 344 (S.D.N.Y. 2009). Further, *Defer*, Goldman's only fraudulent misrepresentation case brought against an auction manager, once again supports Farber. *Defer* recognized that the defendant auction manager was properly charged with knowledge of its own sham ARS auction practices and that individual salespeople are properly charged with their firm's institutional knowledge regarding a fraud like this one, regardless of their personal knowledge. *See Defer*, 654 F. Supp. 2d at 218 n.100. Here, where Goldman both ran the auctions and made direct misrepresentations to Farber, scienter is established.

### 3. Goldman Fails To Proffer An Alternative, Equally Plausible, Innocent Explanation For Its Misstatements

Under the "comparative" inference standard set forth in *Tellabs*, a court is to consider "whether *all* of the allegations, taken collectively, give rise to a strong inference of scienter" and whether, in comparison to "plausible opposing inferences," the inference that defendants acted with scienter is "at least as compelling as any opposing inference." 551 U.S. at 324.

To the extent that Goldman suggests that its misrepresentations regarding the cash equivalency of its PARS were negligence or misguided optimism, not fraud (Def. Br. 13-15), Goldman is wrong for two reasons. First, Farber does not allege inaccurate predictions; he alleges Goldman misrepresented that its PARS were cash equivalents and its PARS auctions

21

were functioning, when it knew that they were not. As the entity that ran the PARS auctions, Goldman knew better than anyone the falsity of its statements. Misrepresentations and omissions, not inaccurate predictions, are the wrongs alleged here. Nor can Goldman assert that it hoped to avoid the collapse of the ARS market. *See Reserve Fund*, 2010 WL 685013, at *8 (misplaced hope that defendants could "preserve the Fund" did not undermine scienter allegations).

Second, this type of defense has been rejected by the Court – defendants cannot engage in misconduct leading to market failure and then seek to avoid liability related to that failure. In *Ambac*, the defendant bond insurer allegedly failed to disclose defects in subprime mortgage derivatives it ensured, but claimed that it was blameless on the theory that it was surprised by the subprime mortgage crisis. *See Ambac*, 2010 WL 727227, at *21. The *Ambac* court held otherwise, reasoning that plaintiffs' allegations that Ambac had lowered its underwriting standards and misrepresented the quality of its debt instruments might have caused the crisis Ambac pointed to. *Id*. at *22. If true, this "would make Ambac an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim." *Id*.

The same is true here. Goldman was not a negligent bystander to the collapse of the PARS market: its sham auction activities were a cause of that collapse. Goldman well knew that it was masking the market's non-viability; and indeed, when Goldman finally stopped secretly supporting its PARS market, the market immediately collapsed. (Def Br. 14.) Farber's allegations undermine any innocent explanation Goldman could proffer.

C.    **Farber Adequately Alleges Reasonable Reliance on Goldman's Misrepresentations**

Goldman suggests that Farber cannot rely upon its misrepresentations because, although

he bought PARS from Goldman, he did not buy the HEFA-issued PARS from Goldman, implying that Section 10(b) or Rule 10b-5 have a privity requirement. (Def. Br. at 13.) There is no such requirement. It is common in securities fraud cases for plaintiffs not to have bought the securities from the defendants they sue; rather, the defendants are issuers or securities firms that (like Goldman) induce plaintiffs to purchase securities on the open market or in other third party transactions through misrepresentations in documents such as offering statements and prospectuses. *See, e.g.*, *DeMarco v. Lehman Bros. Inc.*, 309 F. Supp. 2d 631, 633 (S.D.N.Y. 2004). Farber's case is especially strong because he was Goldman's client and Goldman made false statements to him directly. It is also stronger than recent ARS cases in which plaintiffs alleged reliance on "vague" promises of future conduct. *Ashland*, 2010 WL 1253932, at *13.

### D.      Farber Adequately Alleges that Goldman Caused His Loss

Goldman does not dispute that the PARS market collapsed after it stopped artificially propping it up, nor that the collapse rendered Farber's Goldman PARS virtually unsellable. Yet, Goldman asserts that its fraud was not the loss, or proximate, cause of the damage Farber suffered. Goldman is wrong again.

The doctrine of loss causation, liked the common law element of proximate cause, requires that "damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Thus, a plaintiff must "adequately allege a causal connection between defendants' non-disclosures and the subsequent decline in the value of [] securities." *Id.* A plaintiff must typically allege that the price of the securities at issue dropped as a result of the "truth" being revealed to the market. *Dura,* 544 U.S. at 346-47.

The causal link here is direct. Goldman's misrepresentations and omissions kept Farber

23

and the PARS market from learning that PARS were not actually cash equivalents.  Once the truth came out, the value of the Farber's PARS was destroyed – and it has not recovered.

Again, the legal authority Goldman relies on is readily distinguishable.  For instance, *Healthcare Finance Group*, 669 F. Supp.2d at 345, involved an ARS issuer that had defaulted on its payment obligations.  That default caused the harm to plaintiff, which would have suffered a total loss whether or not the defendants had lied about the liquidity of ARS.  *Id.* at 349-50.  Further, unlike Goldman, Bank Leumi was not running the ARS auctions, and so did not cause the plaintiff's losses.  *Id.*

Similarly, in *In re Citigroup Auction Rate Secs. Litig.*, the plaintiffs did not allege reliance on misrepresentations about ARS liquidity.  2009 WL 2914370, at *5 (S.D.N.Y. Sept. 11, 2009).  Rather, the plaintiffs conclusorily alleged that Citigroup's auction-related activities constituted market manipulation, and that they had relied on the integrity of market pricing in purchasing Citigroup ARS.  *Id.*  Absent allegations concerning the efficiency of the ARS market, the Court dismissed plaintiff's claim of reliance on the specific prices and yields of ARS.  Similarly, those plaintiffs could not show that the deficiently pled acts of market manipulation proximately caused their losses.  *Id.* at *9.  In this case, however, Farber is not alleging market manipulation; he has pled specific, material misrepresentations and omissions that were the cause of his damages.  *In re Merrill Lynch Auction Rate Secs. Litig.* is similarly inapposite, since it also addressed allegations of market manipulation by an ARS auction manager, and failed because the plaintiffs did not allege reasonable reliance on ARS market efficiency.[10]  *See* 2010 WL 1257597, at *13-14.

---

[10] Farber states a viable control person claim under Section 20(a) of the 1934 Act, which is violated when a controlled person commits a primary violation and the controlling person is a culpable participant. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007).  Farber alleges both a primary violation by Goldman and that his Goldman sales team committed independent Section 10(b)

Goldman caused Farber's loss and it should be held accountable for its unlawful conduct.

## CONCLUSION

For the reasons stated above, we respectfully request that the Court deny defendants'

motion to dismiss.

Respectfully submitted,

Dated: April 8, 2010

CLARICK GUERON REISBAUM LLP

By:  _____ s/ Nicole Gueron _____ .

Nicole Gueron
Emily Reisbaum
40 West 25th Street, 12th Floor
New York, N.Y. 10010
212.633.4312
ngueron@cgr-law.com

David R. Lurie
Law Office of David R. Lurie
194 President Street
Brooklyn, N.Y. 11231
347.651.0294

Attorneys for Plaintiff Jonathan Farber

---

violations; Goldman was a culpable participant because its sales staff were parroting misrepresentations contained in Goldman's written account statements. *See Ambac*, 2010 WL 727227, at *25. Also, *respondeat superior* establishes Goldman's liability under the federal securities laws. *In re Paramalat Sec. Litig.*, 474 F. Supp.2d 547, 550 n.12 (S.D.N.Y. 2007). Finally, for the reasons stated above, Farber states a claim for breach of fiduciary duty under Connecticut law.